UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------------- x

UBS FINANCIAL SERVICES, INC. and          :
UBS SECURITIES LLC,                       :     Case No. CV  12-5019 RGK (JCx)
                                          :
                                          :     Hon. R. Gary Klausner
                    Plaintiffs,           :
                                          :     **MEMORANDUM IN**
     -against-                            :     **OPPOSITION TO MOTION**
                                          :     **FOR PRELIMINARY INJUNCTION**
CITY OF PASADENA, CALIFORNIA              :
                                          :
                    Defendants.           :

-------------------------------------------------------- x

475996v.1

# TABLE OF CONTENTS

Page

**OVERVIEW** ........................................................................2

  **A.** Pasadena issued auction rate securities. ..................2

  **B.** UBS withheld material information and engaged
in other misconduct. ...........................................4

  **C.** Procedural history of Pasadena's claims ..................5

**ARGUMENT** .....................................................................6

  **A.** UBS is collaterally estopped from arguing that Pasadena
is not its customer based on prior decisions of the SDNY
and Second Circuit in *UBS v. WVUH*. ....................7

    **i.** The *UBS v. WVUH* decision ............................7

    **ii.** Issue preclusion bars UBS from relitigating
the "customer" issue. ....................................12

  **B.** Pasadena's claims constitute a dispute between a FINRA
member and its customer, and the dispute relates to the
business activities of the member. .......................15

    **i.** Judicial precedent, administrative precedent, and
UBS's past conduct all support the conclusion that
Pasadena is a customer. ................................15

      *1. Judicial precedent* ....................................15

      *2. Administrative precedent* ...........................17

      *3. UBS's past conduct* ..................................17

    **ii.** The cases cited by UBS are plainly distinguishable. ....18

  **C.** The MSRB rules do not compel a different result. ......19

    **i.** FINRA Rules apply in the municipal context. ..........20

    **ii.** Pasadena is a "customer" of UBS under the MSRB Rules. ..........21

i

**D.   The balance of hardships does not decidedly favor UBS.**........................ 23

**E.   An injunction in favor of UBS would not be in the public interest.** ....................................................................... 25

**CONCLUSION**................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ....................................................................7

*Berthel Fisher & Co. Fin. Services, Inc. v. Larmon*,
  11-cv-889, 2011 WL 3294682 (D. Minn. Aug. 1, 2011) .................................... 19

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
  402 U.S. 313 (1971) ..................................................................................... 12

*Cal. Pharmacists Ass'n v. Maxwell–Jolly*,
  563 F.3d 847 (9th Cir. 2009) .........................................................................6

*Contemporary Fin. Solutions, Inc. v. Miller*,
  07-cv-00793, 2007 WL 4197588 (D. Colo. Nov. 20, 2007) .............................. 19

*Dees v. Distenfield*,
  618 F.Supp. 123 (C.D. Cal. 1985 ................................................................ 24

*Developmental Services Network v. Douglas*,
  666 F.3d 540 (9th Cir. 2011) .........................................................................7

*Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*,
  264 F.3d 770 (8th Cir. 2001) ........................................................................ 18

*Goldman Sachs & Co. v. Becker*,
  07-cv-01599, 2007 WL 1982790 (N.D. Cal. July 2, 2007)............................... 19

*Herbert J. Sims & Co., Inc. v. Roven*,
  548 F. Supp. 2d 759 (N.D. Cal. 2008).................................................... 15, 19

*In re Daily*,
  47 F.3d 365 (9th Cir. 1995) ..................................................................... 12, 14

*In re Pac. Gas & Elec. Co.*,
  08-cv-1211, 2008 WL 2004275 (N.D. Cal. May 5, 2008).................................. 24

*Interactive Brokers, LLC v. Duran*,
  08-cv-6813, 2009 WL 393827 (N.D. Ill. Feb. 17, 2009...................................... 19

*J.P. Morgan Secs. Inc. v. La. Citizens Property Ins. Corp.*,
   712 F. Supp. 2d 70 (S.D.N.Y. 2010) ..................................................... 16

*Kourtis v. Cameron*,
   419 F.3d 989 (9th Cir. 2005) ............................................................... 12

*Lopez v. Brewer*,
   --- F.3d ----, 2012 WL 1693926 (9th Cir. 2012) ............................... 6, 7

*Lummus Co. v. Commonwealth Oil Refining Co.*,
   297 F. 2d 80 (2d. Cir. 1961) ................................................................ 13

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997 ................................................................................6

*Montana v. U. S.*,
   440 U.S. 147  (1979) ............................................................................ 25

*Morgan Keegan & Co. v. Shadburn*,
   829 F. Supp. 2d 1141 (M.D. Ala. 2011) .............................................. 19

*Morgan Keegan & Co., v. Drzayick*,
   11-cv-126, 2011 WL 5403031 (D. Idaho, Nov. 8, 2011) ..................... 19

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
   460 U.S. 1 (1983) ................................................................................ 25

*Patten Secs. Corp. v. Diamond Greyhound*,
   819 F.2d 400 (3d Cir. 1987) ........................................................... 16, 17

*Pimentel v. Dreyfus*,
   670 F.3d 1096 (9th Cir. 2012) ...............................................................7

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ............................................................... 12

*Ross Sinclaire & Assoc. v. Premier Senior Living, LLC*,
   4:11-cv-05104 (N.D. Cal. June 27, 2012) ............................................ 17

*San Remo Hotel, L.P. v. San Francisco City and County*,
   364 F.3d 1088 (9th Cir. 2004) ............................................................. 12

*Shaw v. Hahn*,
  56 F.3d 1128 (9th Cir. 1995) ............................................................... 12

*Sierra Club v. Hickel*,
  433 F.2d 24 (9th Cir. 1970), *aff'd sub nom.*,
  *Sierra Club v. Morton*, 405 U.S. 727 (1972)............................................6

*Skilstaf, Inc. v. CVS Caremark Corp.*,
  669 F.3d 1005 (9th Cir. 2012) ............................................................. 15

*Smoothline Ltd. v. N. Am. Foreign Trading Corp.*,
  249 F.3d 147 (2d Cir. 2001) ................................................................ 24

*Solomon v. North American Life and Cas. Ins. Co.*,
  151 F.3d 1132 (9th Cir. 1998) ............................................................. 24

*Stalberg v. W. Title Ins. Co.*,
  230 Cal. App. 3d 1223 (Ct. App. 1991 ................................................. 24

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ............................................................. 23

*Syverson v. International Business Machines Corp.*,
  472 F.3d 1072 (9th Cir. 2007) ............................................................. 14

*UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*,
  760 F. Supp. 2d 373, 378 (S.D.N.Y. 2011) *aff'd in part, vacated
  in part on other grounds,* 660 F.3d 643 (2d Cir. 2011).............................. passim

*UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*,
  660 F.3d 643 (2d Cir. 2011) ................................................................ passim

*Wachovia Sec., LLC v. Raifman*,
  10-cv-04573, 2010 WL 4502360 (N.D. Cal. Nov. 1, 2010) .............................. 15

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................6

iv

**Statutes**

Cal. Code Civ. P. § 343 ................................................................................................ 24

**Other Authorities**

S.E.C. Release No. 39378 (December 1, 1997) ............................................................ 21

Wright, Miller & Cooper, Federal Practice and Procedure:
    Jurisdiction 2d § 4445 .......................................................................................... 14

**Rules**

FINRA Rule 12100 ...................................................................................................... 21

FINRA Rule 12200 ............................................................................................... passim

MSRB Rule D-9 .......................................................................................................... 22

MSRB Rule G-17 ........................................................................................................ 23

MSRB Rule G-35 ........................................................................................................ 21

475996v.1

1    Defendant City of Pasadena, California ("Pasadena") respectfully submits

2  this opposition to the Motion for Preliminary Injunction filed by UBS Financial

3  Services, Inc. and UBS Securities LLC (collectively,  "UBS").

4    In 2004 and 2006, Pasadena engaged UBS to underwrite and design a

5  structure for two bond issuances.  On both occasions, UBS provided advice and

6  recommendations to Pasadena and helped design the ultimate financing structure.

7  Pasadena relied on UBS's advice and recommendations.   And both times,

8  Pasadena paid UBS for those services.  Moreover, UBS recommended to Pasadena

9  that it issue its bonds as auction rate securities ("ARS"), which ensured that UBS

10  would receive a continuing stream of payments as the broker-dealer for Pasadena's

11  ARS.  Under any reasonable interpretation of the word "customer," Pasadena was

12  UBS's customer, and is entitled to demand FINRA arbitration.  UBS's motion

13  should be denied.

14    Applying the Ninth Circuit's test for determining whether to grant motions

15  for preliminary injunction, the balance of hardships does not favor UBS, so it must

16  show a fair chance of success on the merits.  Under this merits standard, or even a

17  serious questions standard, UBS's showing is insufficient.

18    This court is not the first court to address whether ARS issuers that utilized

19  UBS as an underwriter and broker-dealer are UBS's customers.  The issue of

20  whether an ARS issuer is a customer of its underwriter and broker-dealer for the

21  purposes of demanding arbitration under FINRA Rule 12200 has been litigated

22  numerous times in the Second Circuit – including by UBS, which based on those

23  prior decisions is collaterally estopped from disputing that Pasadena is its

24  customer.  The courts that have looked at this issue have all concluded that,

25  because ARS issuers like Pasadena paid for the services their underwriters and

26  broker-dealers provided, they are customers for the purposes of FINRA Rule

1

1   12200.  Further, contrary to UBS's arguments, the MSRB's rules clearly provide

2   that FINRA's rules, not the MSRB's rules, govern issues of arbitrability.

3         Courts have held that forcing a party to arbitrate a claim that is not subject to

4   arbitration causes irreparable harm.  Even so, UBS misstates both the strength of

5   Pasadena's claims and the applicable statute of limitations in its description of this

6   harm.  Nonetheless, on the balance of the hardships, the hardship to UBS does not

7   outweigh the hardship to Pasadena, which has a right to a speedy arbitration that is

8   frustrated by UBS's insistence that it be allowed to relitigate an issue it has already

9   exhaustively litigated.  Finally, regarding the public interest, the public interests in

10   arbitration as an efficient dispute resolution system and the finality of litigation are

11   not served by permitting a party to relitigate the same issue of arbitrability with

12   each successive arbitral plaintiff.

13                      **OVERVIEW**

14   **A.**      **Pasadena issued auction rate securities.**

15         Defendant City of Pasadena, California, is a city of approximately 137,000

16   people located in Los Angeles County.  In 2004 and 2006, it sought to raise funds

17   to refinance prior indebtedness and make improvements to the Pasadena

18   Conference Center and other facilities.  Pasadena decided to raise the money for

19   these undertakings through the issuance of municipal bonds.  To determine the

20   optimal financing structure for these bonds, Pasadena engaged UBS to recommend

21   a financing structure.[1]  UBS indeed did recommend a financing structure on which

22   Pasadena relied.[2]

23         As alleged in the Statement of Claim, UBS was not merely Pasadena's

24   underwriter, but also its advisor:

---

[1] *See* Declaration of Vic Erganian, at ¶¶ 3-4.

[2] *Id.*

1     22.    Pasadena engaged UBS to assist with the financing.  The parties

2     agreed that the transaction would be 'negotiated,' meaning that UBS

3     worked closely with Pasadena to structure the bond issuance.

4     23.    UBS and its representatives actively participated in structuring

5     and implementing Pasadena's 2004 financing.  UBS ultimately

6     advised Pasadena on what it regarded as the appropriate capital-

7     generation structure for Pasadena's bonds…

8     …

9     36. As in 2004, UBS's representatives participated actively in

10     planning the structure of and implementing Pasadena's financing

11     plans in 2006.  UBS ultimately advised Pasadena on the appropriate

12     structure [3]

13 These facts belie UBS's current assertion that it acted as an arms-length

14 underwriter and nothing more.  UBS Memo in Support at 4.  As alleged, UBS

15 advised Pasadena on the appropriate bond-issuance structure; acted as Pasadena's

16 agent in dealing with bond insurers; bought the issued bonds from Pasadena and

17 resold them; sold interest rate swaps incident to the bond issuances that supposedly

18 supported the structure they recommended; provided continuing advice related to

19 these swaps, including how the swaps should be booked; provided monitoring and

20 advisory services regarding the bonds and the swaps after the issuance; functioned

21 as the main broker-dealer for the auctions; and performed various other tasks as

22 Pasadena's advisor, partner, agent, and fiduciary.

23     Most importantly here, Pasadena <u>paid</u> UBS for its structuring advice, as well

24 as for its broker-dealer services.  UBS charged Pasadena a management fee, which

25 represents a payment to UBS for, among other things, its assistance in structuring

---

[3] Statement of Claim at ¶¶ 20-21.

3

1   the transaction.[4]  Following the issuance of its bonds, Pasadena also paid a broker-
2   dealer fee of 25 basis points to UBS annually in exchange for services managing
3   the auctions for the bonds.

4   **B.    UBS withheld material information and engaged in other misconduct.**

5          In the months of discussions leading up to each bond issuance's closing,
6   UBS failed to disclose critical facts about the ARS market and UBS's role in it.
7   UBS omitted that for many years it had placed support bids at virtually all the
8   auctions for ARS it had underwritten in order to keep these auctions from failing.
9   (*Id.* at ¶ 27).  UBS also failed to disclose that, without its support bids, the auctions
10  would fail and the interest-rate swaps would not function as designed.  (*Id. at ¶¶*
11  29, 41).  At all relevant times, UBS was fully aware that its participation as a
12  bidder at ARS auctions was necessary to prevent auction failures.  (*Id.* at ¶¶ 27).
13  Consequently, UBS knew (but Pasadena did not) that if UBS did not continue to
14  support the ARS bond market, the market would collapse and issuers would be
15  stuck paying the failed-auction rate, several times the prevailing rate for a more
16  conservative fixed-rate issuance.

17         Nevertheless, that UBS recommended to Pasadena that it issue ARS is not
18  surprising: ARS were far more lucrative for UBS than alternative debt structures.
19  As lead broker-dealer, UBS stood to earn 25 basis points a year in remarketing fees
20  (compared to 7 basis points or less for standard variable-rate bonds) and its
21  affiliates also earned a spread on the interest-rate swaps that UBS sold as part of
22  the typical ARS financing.  (*Id.* ¶ 50-52).

---

[4]  *See* Declaration of Vic Erganian, ¶ 4, Exhibit A, Bond Summary Statistics
(disclosing a Management Fee charged for the 2006A and B issuance).  *See also*
Statement of Claim at § 50 ("UBS earned a management fee, which represented a
payment from Pasadena to UBS for UBS's assistance in structuring the
transaction.").

4

1    Initially, Pasadena's auctions and bonds appears to work as promised.  Its

2  auctions were successful in creating a synthetic fixed interest rate – due to the fact

3  that, unbeknownst to Pasadena, UBS placed support bids that set in each auction an

4  interest rate that tracked UBS's projections.  (*Id.* at 32).  Beginning in early 2008,

5  however, UBS stopped submitting support bids generally, and the auction market

6  collapsed, causing the interest rates in Pasadena's auctions to rapidly rise.  (*Id.* at

7  ¶¶ 33, 45).  Ultimately, Pasadena was forced to refinance its bonds at considerable

8  expense.  (*Id.* at ¶¶ 33, 46).

9    In sum, UBS recommended a debt structure to Pasadena that was wholly

10  dependent on the viability of the ARS market, even though UBS knew the ARS

11  market would fail without its active support.  UBS never disclosed this very

12  important fact and, when it withdrew its support, Pasadena was left to pay much

13  higher auction rates, with no protection from its interest rate swap.  UBS profited

14  from its recommendation to Pasadena, and left the taxpayers of Pasadena on the

15  hook for millions in excess interest payments and refinancing fees.

16  **C.    Procedural history of Pasadena's claims**

17    Pursuant to FINRA rules, customers of FINRA members may elect to

18  arbitrate claims arising out of the business activities of FINRA members.[5]  UBS is

19  a FINRA member and Pasadena is its customer because UBS acted at all material

20  times as underwriter of, and broker-dealer for, Pasadena's 2004 and 2006 bonds.

21    On February 11, 2012, Pasadena filed a Statement of Claim initiating

22  FINRA arbitration.  (*See* Stmt. of Claim).  Pasadena alleged that, as outlined above,

23  UBS breached its fiduciary duty to Pasadena.  (*Id.* at ¶¶ 37-39).  Pasadena also

24  stated claims for negligent misrepresentation, fraud, violations of the federal and

25  state securities laws, and breaches of NASD and MSRB rules.  (*Id.* at ¶¶ 40-56).

---

[5] *See* FINRA Rule 12200, attached as Exhibit A to the Declaration of Jason Burge
("Burge Decl.").

1    UBS's Answer to the Statement of Claim was initially due on April 24,

2    2012.[6] At UBS's request, Pasadena consented to a 60-day extension of the time for

3    UBS to file its answer, until June 25, 2012.  That extension was contingent on the

4    parties selecting arbitrators in this matter, and arbitrators have been selected.  On

5    June 11, 2012, UBS filed a complaint and a motion for preliminary injunction in

6    this Court, seeking to enjoin the pending arbitration.

7    **ARGUMENT**

8    A preliminary injunction is an extraordinary remedy involving "the exercise

9    of a very far reaching power never to be indulged except in a case clearly

10    warranting it." *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970), *aff'd sub*

11    *nom.*, *Sierra Club v. Morton*, 405 U.S. 727 (1972) (internal quotations omitted).[7]

12    It may be awarded only upon "a clear showing that the plaintiff is entitled to such

13    relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

14    In the Ninth Circuit, a plaintiff seeking a preliminary injunction must

15    establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer

16    irreparable harm in the absence of preliminary relief; (3) that the balance of

17    equities tips in his favor; and (4) that an injunction is in the public interest. *Lopez*

18    *v. Brewer*, --- F.3d ----, 2012 WL 1693926, at *2 (9th Cir. 2012); *Cal. Pharmacists*

19    *Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 849 (9th Cir. 2009).  "The elements of the

20    preliminary injunction test must be balanced, so that a stronger showing of one

21    element may offset a weaker showing of another.  Serious questions going to the

22    merits and a balance of hardships that tips sharply towards the plaintiff can support

---

[6] *See* Burge Decl., at ¶ 2.

[7] *See also Lopez v. Brewer,* --- F.3d ----, 2012 WL 1693926, at *2 (9th Cir. 2012) ("A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'") (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*).

475996v.1

1   issuance of a preliminary injunction, so long as the plaintiff also shows that there is
2   a likelihood of irreparable injury and that the injunction is in the public interest."
3   *Lopez*, at *2 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,
4   1135 (9th Cir. 2011)) (internal quotations omitted).  "At an irreducible minimum,
5   though, the moving party must demonstrate a fair chance of success on the merits,
6   or questions serious enough to require litigation."  *Pimentel v. Dreyfus*, 670 F.3d
7   1096, 1105-06 (9th Cir. 2012).  When a party fails to show some chance of success
8   on the merits or serious questions going to the merits, no further determination of
9   irreparable harm or balancing of hardships is necessary.  *Developmental Services*
10  *Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011).

11       UBS cannot make the required showing of a "fair chance of success on the
12  merits."  Under FINRA Rule 12200, arbitration is required if Pasadena's claims
13  constitute "a dispute between a FINRA member and its 'customer,' and the dispute
14  relates to the business activities of the FINRA member." Based on prior decisions,
15  UBS is precluded from challenging whether Pasadena is a customer.  UBS cannot
16  clearly show that it is likely to succeed on its argument that Pasadena's claims are
17  not arbitrable. UBS's MSRB arguments also fail because FINRA rules govern
18  arbitration even for MSRB members. In addition, the balance of equities does not
19  favor UBS, and the public interest does not favor parties litigating an issue
20  previously fully litigated, thereby delaying arbitration.

21  **A.    UBS is collaterally estopped from arguing that Pasadena is not its**
22  **customer based on prior decisions of the SDNY and Second Circuit in**
23  ***UBS v. WVUH*.**

24       **i.  The *UBS v. WVUH* decision**

25       In *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650
26  (2d Cir. 2011) (hereafter, "*WVUH*"), UBS sought to enjoin five issuers of ARS
27  from arbitrating their claims that UBS defrauded them by misrepresenting the facts

7

of UBS's bidding policies during the process of structuring their ARS.  The facts and legal claims of *WVUH* are very similar to the present case, as is apparent from the court's description:

> On February 12, 2010, WVUH initiated the FINRA arbitration that is the subject of this appeal by filing an arbitration Statement of Claim against UBS under Rule 12200 of the FINRA Code. Among other claims, WVUH alleged that UBS violated the Securities Exchange Act of 1934 and the Uniform Securities Act by advising WVUH to issue ARS while withholding critical information about the ARS market and UBS's role in it. The Statement of Claim also alleged that UBS fraudulently induced WVUH to purchase auction services, again by withholding critical information about the ARS market and UBS's role. For example, WVUH claimed that UBS failed to disclose its practice of placing support bids in the Dutch auctions for ARS it underwrote (including WVUH's ARS), the significance of that support to the success of the auctions, and that the auctions for WVUH's bonds would fail as soon as UBS stopped submitting support bids. In addition to the substantive claims, WVUH alleged that FINRA had jurisdiction over the claims because WVUH was a "customer[ ] of [UBS] and this dispute [arose] from the business activities of [UBS], including but not limited to underwriting and broker-dealing."[8]

---

[8] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 660 F.3d 643, 646-47 (2d Cir. 2011).

1  The primary issue in *WVUH* was whether WVUH, as an issuer of ARS, was

2 a customer of UBS, its underwriter and broker-dealer.[9] UBS's preliminary

3 injunction was denied because while UBS established irreparable harm (it was not

4 contested), it failed to demonstrate a likelihood of success on the merits of the

5 "customer" issue and the balance of the hardships favored the party seeking

6 arbitration, which had a "right to a speedy arbitration of their claims."[10]

7  Following the denial of UBS's motion for preliminary injunction, the district

8 court asked UBS whether it intended to pursue further proceedings.[11] Rather than

9 seek discovery or a permanent injunction, UBS requested the entry of a final order

10 of dismissal, because it sought to "seek review by the Second Circuit on an

11 expedited basis" and believed that "it would be sensible and efficient for that

12 appeal to go forward on the basis of the present record and the [Court's

13 decision]."[12] UBS represented, "[g]iven the nature of the case, *it seems unlikely*

14 *that discovery and full development of the case at the district court level would*

15 *lead to a different outcome than is stated in the [Court's decision]*."[13]

16  On appeal, the Second Circuit affirmed on the alternative ground that

17 WVUH was UBS's customer because UBS rendered services to WVUH in its

---

[9] *See UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373, 379 (S.D.N.Y. 2011) ("Thus, the only remaining question is whether Defendants qualify as 'customers' of UBS under the FINRA code."); *WVUH*, 660 F.3d at 645 ("With respect to both the bond issuance it underwrote and the auctions it agreed to facilitate, UBS asserted that WVUH was not its 'customer' entitled to arbitration under FINRA Rule 12200.").

[10] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373, 379 (S.D.N.Y. 2011) *aff'd in part, vacated in part,* 660 F.3d 643 (2d Cir. 2011).

[11] *Id.* at 380. ("ORDERED that UBS is directed to inform the Court by January 11, 2011 whether, in light of the instant ruling, it contemplates any further proceedings in this Court.").

[12] *See* Burge Decl., Exhibit C.

[13] *Id.* (emphasis added).

9

1    capacity as a broker-dealer charged with facilitating WVUH's ARS auctions.  In

2    response to UBS's argument that the term "customer" should be limited to

3    investors or unsophisticated parties, the court found that FINRA's rules

4    contemplate "large or complex cases" including "customers who are well-

5    capitalized or sophisticated institutions and individuals," and that FINRA's stated

6    purposes encompass much more than a mere investor-protection mandate.[14]   In

7    response to UBS's argument that WVUH's lawsuit did not arise from its broker-

8    dealing services, the Second Circuit noted that each transaction clearly

9    contemplated the issuance of ARS to be serviced by UBS, and because the

10   Statement of Claim, in describing UBS's misconduct, referred to UBS's policies as

11   a broker-dealer in the "auction services transactions … are integrally related to and

12   of a piece with the underwriting services UBS provided."[15]  The court continued:

13          Our holding is that, in this case, UBS cannot avoid arbitration by

14          arguing that WVUH was a customer only in a limited respect when

15          the customer relationship is part of a series of interrelated transactions

16          serving a common purpose and when there is a "contractual basis for

17          concluding that the party agreed to" arbitration with a party that was

18          its customer under the FINRA Rules.[16]

19          Following the appeal, arbitration proceeded.

20          UBS argues the *WVUH* decision has no application here, because the Second

21   Circuit "explicitly declined to reach the issue of whether an issuer was a

22   'customer' of an underwriter, affirming on alternate grounds."[17]  This is wrong.

23   The Second Circuit concluded that it did not need to address whether *every issuer*

---

[14] *UBS Fin. Servs., Inc.* 760 F. Supp. 2d at 651-52.

[15] *Id.* at 652-53.

[16] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 660 F.3d 643, 653 n. 6 (2d Cir. 2011).

[17] Memo in Support at 16.

1   is a customer of its underwriter.  The Second Circuit was quite clear that *an issuer*

2   *of ARS* is obviously a customer of its underwriter and broker-dealer, where the

3   ARS issuer pays considerable fees for broker-dealer services from its underwriter

4   and broker-dealer.[18]  The court noted that broker-dealer services "are integrally

5   related" to the services UBS provided as underwriter and that WUVH's Statement

6   of Claim characterized the underwriting and broker-dealer services as "part of an

7   integrated whole."[19] As the court stated:

> 8   Under any conceivable interpretation of Rule 12200's nexus
>
> 9   requirement that the dispute "arises in connection with the business
>
> 10   activities of the member," the allegations here satisfy the requirement
>
> 11   . . . and link the grievance WVUH asserts in arbitration to the
>
> 12   transaction that established its customer status.[20]

13   Here, UBS was Pasadena's underwriter and broker-dealer, and as noted by the

14   Second Circuit, the two services are "integrally related." The Second Circuit

15   decision is precisely on point.

16      Further, in this case the evidence that Pasadena is a customer is considerably

17   stronger than it was in *WVUH*.  In *WVUH*, there was no evidence before the court

18   that WVUH had paid separately for UBS's services structuring the transaction.  By

19   comparison, here there is evidence that Pasadena paid UBS a management fee

20   specifically for UBS's services managing and structuring the transaction.[21]

21   Accordingly, under the Second Circuit's reasoning that a customer is one who

---

[18] *WVUH*, 660 F.3d at 650 ("We need not resolve whether its ruling on this ground was correct, since we affirm on the different ground that WVUH was UBS's customer because WVUH purchased a service, specifically auction services, from UBS.").

[19] *Id*. at 652-53.

[20] *Id*. at 653.

[21] *See* Declaration of Vic Erganian, Exhibit A, Bond Summary Statistics (disclosing a Management Fee charged for the 2006A and B issuance).

1    "buys goods or services," here Pasadena would be a customer specifically in

2    relation to UBS's services in structuring the transaction, because Pasadena paid for

3    those services in addition to paying fees to UBS for its broker-dealing.

4    **ii.  Issue preclusion bars UBS from relitigating the "customer" issue.**

5    The doctrine of issue preclusion "forecloses relitigation of factual or legal

6    issues that have been actually and necessarily decided in earlier litigation." *San*

7    *Remo Hotel, L.P. v. San Francisco City and County*, 364 F.3d 1088, 1094 (9th Cir.

8    2004); *Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995).  Once "a party has been

9    accorded a full and fair opportunity to litigate an issue in a prior proceeding, due

10    process is not violated by denying the party a further opportunity to litigate the

11    same issue in a subsequent proceeding."  *In re Daily*, 47 F.3d 365, 369 (9th Cir.

12    1995) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313,

13    328-29 (1971)).   Issue preclusion is appropriate where:

14    (1) the issue necessarily decided at the previous proceeding is

15        identical to the one which is sought to be relitigated;

16    (2) the first proceeding ended with a final judgment on the merits; and

17    (3) the party against whom collateral estoppel is asserted was a part or

18        in privity with a party at the first proceeding.

19    *Reyn's Pasta Bella, LLC v. Visa USA, Inc..*, 442 F.3d 741, 746 (9th Cir. 2006)

20    (quoting *Kourtis v. Cameron*, 419 F.3d 989, 994 (9th Cir. 2005)).

21    Here, there can be little dispute that the issue – whether an ARS issuer is a

22    customer entitled to arbitrate claims of misrepresentation and fraud against its

23    underwriter and broker-dealer – is identical to the issue previously decided in

24    *WVUH*.  UBS is also the *identical* party raising this *identical* issue.

25    Regarding finality of the *WVUH* ruling, ordinarily a judgment on a

26    preliminary injunction is not a final judgment.  However, as the court noted in

27    *Lummus Co. v. Commonwealth Oil Refining Co.*:

12

1      Whether a judgment, not "final" in the sense of 28 U.S.C. § 1291,
2      ought nevertheless be considered "final" in the sense of precluding
3      further litigation of the same issue, turns upon such factors as the
4      nature of the decision (i.e., that it was not avowedly tentative), the
5      adequacy of the hearing, and the opportunity for review.  "Finality" in
6      the context here relevant may mean little more than that the litigation
7      of a particular issue has reached such a stage that a court sees no
8      really good reason for permitting it to be litigated again.[22]

9  In *Lummus*, Commonwealth obtained a district court order preliminarily enjoining

10  an arbitration initiated by Lummus on the basis that the agreement had been

11  fraudulently induced.[23]  On appeal, the First Circuit held that Commonwealth had

12  not established a substantial issue relating to fraud in the inducement, reversed the

13  lower court, and ordered arbitration.  Lummus moved to compel arbitration in New

14  York, and Commonwealth again sought a stay of the arbitration for a trial on

15  arbitrability.  The Second Circuit concluded that the First Circuit's decision was

16  not meant to be tentative, and that due to the appeal, the parties and the court

17  obviously had adequate opportunity for briefing and review.[24]  The Second Circuit

18  noted that "the general policy of preventing relitigation applies with peculiar force

19  to issues preliminary to arbitration," and held that issue preclusion prevented

20  Commonwealth from relitigating fraud in the inducement.[25]

21      Similarly, UBS twice had the opportunity to brief whether an ARS issuer is

22  a customer of its underwriter and broker-dealer.  UBS also announced that further

23  proceedings would not affect the outcome.  UBS cannot decry the inadequacy of

---

[22] *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F. 2d 80, 89 (2d. Cir. 1961) (Friendly, J.).

[23] *Id.*

[24] *Id.* at 89-90.

[25] *Id.*

1   prior procedures when it chose those procedures. The prior judgments are

2   sufficiently final to justify preclusion of the issue raised here, at least for the

3   purposes of a preliminary injunction.[26]   UBS's claim that Pasadena is not its

4   customer for the purposes of FINRA Rule 12200 is barred by collateral estoppel.[27]

---

[26] *See also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4445 at 305, ("Preclusion may be properly applied [based on a ruling on a preliminary injunction], however, if the same showing are made and it appears that nothing more is involved than an effort to invoke a second discretionary balancing of the same interests.").

[27]   Two additional issues relating to preclusion that UBS may raise – (1) whether Pasadena, who was not a party to *WVUH*, may benefit from issue preclusion, and (2) whether the doctrine of issue preclusion requires a court in the Ninth Circuit to recognize the preclusive effect of a ruling of the Second Circuit – need not detain us long.

     The rule of mutuality in issue preclusion has been abandoned by the federal courts, and courts in this circuit routinely recognize issue preclusion by third parties (so called non-mutual issue preclusion) provided that such preclusion is fair. *See, e.g., Syverson v. International Business Machines Corp.*, 472 F.3d 1072 (9th Cir. 2007); *Appling*, 340 F.3d at 775. The principal concern of courts considering the fairness of non-mutual issue preclusion is whether the first case offered the party resisting preclusion a full and fair opportunity to present its case. *See, e.g., In re Daily*, 47 F.3d at 369. "[W]here a party has been accorded a full and fair opportunity to litigate an issue in a prior proceeding, due process is not violated by denying the party a further opportunity to litigate the same issue in a subsequent proceeding." *Id.* There can be no dispute that UBS had an incentive to pursue its claims in the *WVUH* case fully and vigorously, and in fact did so, so there is no unfairness in applying issue preclusion here.

     The fact that *WVUH* was decided in the Second Circuit should not defeat preclusion. Courts in the Ninth Circuit routinely recognize the preclusive effect of decisions from other Circuits. *See, e.g., Skilstaf, Inc. v. CVS Caremark Corp.,* 669 F.3d 1005, 1021-25 (9th Cir. 2012) (applying issue preclusion based on ruling of a Massachusetts federal district court). UBS has not identified any law specific to the Ninth Circuit that would compel a different result in this case.

14

**B.    Pasadena's claims constitute a dispute between a FINRA member and its customer, and the dispute relates to the business activities of the member.**

### i.    Judicial precedent, administrative precedent, and UBS's past conduct all support the conclusion that Pasadena is a customer.

FINRA Rule 12200 requires that FINRA members arbitrate disputes arising in connection with their business activities if "requested by a customer." This rule creates an arbitration agreement between FINRA members and their customers.[28] UBS argues that Pasadena has no right to request arbitration under FINRA Rule 12200 because, according to UBS, Pasadena is not a "customer" within the meaning of that rule. UBS's argument fails.

### 1.  Judicial precedent

FINRA defines "customer" broadly: "A customer shall not include a broker dealer."[29] Every court that has addressed the issue has held that an issuer of securities, no less than an investor in securities, is a "customer" within the meaning of FINRA Rule 12200.[30] Two of these courts specifically held that ARS issuers

---

[28] *See Wachovia Sec., LLC v. Raifman*, C 10-04573 SBA, 2010 WL 4502360, at *5 (N.D. Cal. Nov. 1, 2010) (noting that under Rule 12200 "customers can compel registered members of FINRA to arbitrate certain disputes even when no written arbitration agreement exists"); *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 763 (N.D. Cal. 2008) (same).

[29] FINRA Rule 12100, attached as Exhibit G to Burge Decl.

[30] *See, e.g., UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc.*, 760 F. Supp. 2d 373, 378 (S.D.N.Y. 2011) *aff'd in part, vacated in part on other grounds,* 660 F.3d 643 (2d Cir. 2011) ("FINRA intended for an issuer to be a customer of an underwriter"); *Patten Secs. Corp. v. Diamond Greyhound*, 819 F.2d 400, 406 (3d Cir. 1987) (stating that an issuer "is a public customer entitled to demand NASD arbitration") (abrogated on other grounds); *J.P. Morgan Secs. Inc. v. La. Citizens Property Ins. Corp.*, 712 F. Supp. 2d 70, 80 (S.D.N.Y. 2010) ("This dispute arises directly from the parties' issuer/underwriter relationship—which, as discussed, did create a customer relationship between the parties.").

15

475996v.1

1   are "customers" of their underwriters and broker-dealers pursuant to FINRA Rule

2   12200.[31]   The rationale of these ARS issuer cases is very straight-forward and

3   plainly applies here.  To reiterate, the Second Circuit explained that the issuer in

4   *WVUH* was a customer because:

5   • FINRA defines a "customer" as "not a broker or a dealer."  This is a very

6   broad definition.  *WVUH*, 660 F.3d at 649-50.[32]

7   • The dictionary defines customer as "someone who buys goods or services."

8   *Id.* at 650.  Thus, the "term 'customer' includes at least a non-broker or non-

9   dealer who purchases, or undertakes to purchase, a good or service from a

10   FINRA member." *Id.*

11   • WVUH, as an ARS issuer, "became UBS's customer under Rule 12200 by

12   contracting with UBS to obtain auction services for a fee." *Id.*

13   Here, Pasadena not only obtained auction services for a fee but also paid a

14   management fee for UBS's efforts in structuring the transaction.   UBS's

15   withholding of information and related conduct in these two roles – namely, as

16   underwriter in structuring the transaction at issue for Pasadena and as broker-dealer

17   in submitting undisclosed bids to prop-up the ARS market – form the basis for

18   Pasadena's claims.  Because Pasadena, as an ARS issuer, purchased services from

19   UBS in the form of assistance in structuring a transaction and also paid ongoing

20   broker-dealer fees, Pasadena was a customer.[33]

---

[31] *UBS*, 660 F.3d 643 (ARS issuer was "customer" of UBS and was entitled to demand FINRA arbitration); *J.P. Morgan*, 712 F. Supp. 2d 70 (ARS issuer was "customer" of J.P. Morgan and was entitled to demand FINRA arbitration).

[32] In an online glossary, FINRA broadly defines customer as "a person or entity (not acting in the capacity of an associated person of member) that transactions business with any member firm and/or associated person." *WVUH* at 650.

[33] The *WVUH* was recently cited with approval by the Northern District of California in the case of *Ross Sinclaire & Assoc. v. Premier Senior Living, LLC*, 4:11-cv-05104 –YGR.   The court there recently granted a motion to compel

## 2.  Administrative precedent

The NASD's National Arbitration Committee[34] specifically determined that "an issuer of securities should be considered a public customer of a member firm." *Patten*, 819 F. 2d at 406.  And FINRA also determined that issuers like Pasadena are entitled to demand arbitration.   After J.P. Morgan lost its motion for preliminary injunction in *Louisiana Citizens*, it moved the FINRA director to decline to exercise his jurisdiction to arbitrate the dispute, arguing that it was not properly arbitrable under FINRA's rules.[35]   The FINRA director refused, and ordered J.P. Morgan to arbitrate its claims with its ARS issuer-customer.[36]

## 3.  UBS's past conduct

Finally, UBS has previously arbitrated, and is continuing to arbitrate, multiple disputes brought by ARS issuers who claim they are customers of UBS. UBS arbitrated the WVUH claim, and has recently filed answers and is proceeding in arbitration with claims filed by another five ARS issuers without any effort to

---

[34] arbitration filed by an issuer of Variable Rate Demand Obligations (another form of variable-rate debt that, like ARS, requires payment of ongoing remarketing fees) against its underwriter on the basis of a finding that the issuer was a customer of its underwriter under FINRA Rule 12200.  *See*, Exhibit D to Burge Decl., Order Granting Petition to Compel Arbitration and Stay Proceedings, *Ross Sinclaire & Assoc. v. Premier Senior Living, LLC*, No. 11-CV-5104 YGR, United States District Court for the Northern District of California (June 27, 2012).

[34] The NASD was the predecessor of FINRA.

[35] Burge Decl., Exhibit E.

[36] *See* Burge Decl., Exhibit F.  *See also WVUH*, 660 F.3d at 652 ("FINRA appears to have rejected the interpretation of FINRA's rules advanced by UBS and the dissent. While this appeal was pending, UBS raised the very argument it raises here in seeking a stay of arbitration from the Director of FINRA Dispute Resolution, who 'perform[s] all the administrative duties relating to arbitrations submitted under the Code.' FINRA Rule 12103. That motion was summarily denied. Though we need not rely on FINRA's decisions to conclude that WVUH was UBS's customer, we note that FINRA's practical application of its own rules in this case does not support UBS's position.").

1  prevent arbitration.[37]  UBS's present arguments are inconsistent with the fact that

2  UBS is presently arbitrating identical claims.

3      **ii.  The cases cited by UBS are plainly distinguishable.**

4      Despite the overwhelming judicial and administrative precedent establishing

5  that Pasadena is a customer, UBS argues that "customer," as that term is used in

6  Rule 12200, should be limited to customers who "receive investment or brokerage

7  services."  The cases on which UBS relies for this argument, however, are plainly

8  distinguishable.

9      In *Fleet Boston*, a FINRA member sued to recover fees that it earned

10  advising a company in connection with a merger.[38]  The company countered by

11  demanding arbitration.  The court examined Rule 12200 and held that a customer

12  is "one who receives investment and brokerage services or otherwise deals more

13  directly with securities than what occurred here."  *Fleet Boston*, 264 F.3d at 772.

14  The court went on to note that an issuer should be able to arbitrate a claim arising

15  from an underwriting relationship, because "[a]lthough the relationship between

16  [the issuer and underwriter] was not a broker/investor relationship, it still related

17  directly to the issuance of securities, rather than banking advice." *Id.* at 773 n.3.  In

18  short, *Fleet Boston* does not stand for the proposition that only investors can

19  compel FINRA arbitration; rather it holds that arbitration under the organization

20  that oversees the securities industry is reserved for customers who receive goods or

21  services related to securities.  That definition of customer includes Pasadena.

---

[37] *See* Burge Decl., at ¶ 8.  UBS is challenging the arbitrability of an arbitration
brought by Carilion Clinic, in the case captioned *UBS Financial Services, Inc. and
Citigroup Global Markets Inc. v. Carilion Clinic*, United States District Court for
the Eastern District of Virginia, No. 3:12-cv-424 (JAG).

[38] *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc*., 264 F.3d 770, 772 (8th
Cir. 2001).

1    The other cases cited by UBS in favor of an "investor or brokerage"

2    limitation on the term "customer" all concern privity.  In each case, the issue

3    before the court was whether an investor who invested with a third party

4    nonetheless has a sufficiently close relationship with the member firm to qualify as

5    a customer.[39]  Privity is not an issue here.  Further, because every case cited by

6    UBS involved investors, the issue of whether "customer" should be limited to

7    investors was obviously not a live issue in those cases.[40]

8    **C.    The MSRB rules do not compel a different result.**

9        In an attempt to avoid the FINRA Rules and courts' common-sense

10   interpretation of them, UBS here contends that (1) the MSRB Rules – not the

---

[39] *Morgan Keegan & Co. v. Shadburn*, 829 F. Supp. 2d 1141, 1147 (M.D. Ala. 2011) (defendant-investor was not a customer where "Keegan's position is that there never was any sort of relationship between it and [plaintiff]"); *Berthel Fisher & Co. Fin. Services, Inc. v. Larmon*, CIV. 11-889 ADM/JSM, 2011 WL 3294682 (D. Minn. Aug. 1, 2011) (defendant-investor was not a customer of plaintiff-firm where defendants invested with a customer of the firm); *Interactive Brokers, LLC v. Duran*, 08-CV-6813, 2009 WL 393827 (N.D. Ill. Feb. 17, 2009) (defendant-investors were not customers of plaintiff-firm where defendants invested with a third-party); *Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 761 (N.D. Cal. 2008) (same); *Goldman Sachs & Co. v. Becker*, C 07 01599 WHA, 2007 WL 1982790 (N.D. Cal. July 2, 2007) (same); *Morgan Keegan & Co., v. Drzayick*, 11-126, 2011 WL 5403031 (D. Idaho, Nov. 8, 2011) (same); *Contemporary Fin. Solutions, Inc. v. Miller*, 07-CV-00793-M, 2007 WL 4197588 (D. Colo. Nov. 20, 2007) (defendant-investors were not customers where they "never had a direct business relationship with either Defendant").

[40] UBS also suggests that the use of "customer" in the Broker-Dealer Agreements when referring to investors precludes Pasadena from being a customer.  Memo in Support at 17.  Certainly, investors who purchase ARS through UBS are customers, but that does not preclude Pasadena from also being UBS's customer, given that Pasadena is paying UBS to perform the services described in the Broker-Dealer Agreement.  And these sections of the Broker-Dealer Agreement, which address how UBS should handle investor bids during auctions, do not even purport to define customer for the purposes relevant here.

19

1   FINRA Rules – define who is a "customer" in the *municipal* securities context, and
2   (2) under the MSRB Rules, Pasadena is not a "customer."

3        UBS is wrong on both counts.   First, in the municipal context, UBS is
4   subject to the rules of *both* organizations, and FINRA's Rules are the applicable
5   rules relating to arbitration.  Second, even if the MSRB Rules alone governed the
6   underlying dispute, Pasadena would be a "customer" under the MSRB Rules.

7        **i.  FINRA Rules apply in the municipal context.**

8        FINRA is a self-regulatory organization that oversees the securities industry.
9   The MSRB is a self-regulatory organization that oversees the municipal securities
10   industry specifically.  UBS is a member of both organizations.

11        As part of its regulatory program, FINRA operates the largest dispute
12   resolution forum in the securities industry.  The MSRB, until 1998, also operated a
13   dispute resolution forum for disputes involving municipal securities specifically.
14   Since 1998, however, disputes involving municipal securities have been arbitrated
15   or mediated by FINRA, and MSRB members have been subject to FINRA Rules.
16   This transition was approved and announced by the S.E.C. in a notice that
17   expressly stated that henceforth MSRB members shall be deemed members of, and
18   subject to the rules of, FINRA (then, the NASD):

19        Those MSRB members who are not also members of another SRO
20        (the bank dealers) will now be deemed "members" of the NASD for
21        purposes of arbitrating claims involving the municipal securities
22        activities of bank dealers.  The proposed rule change accomplishes
23        this by subjecting every bank dealer, as of January 1, 1998, to the
24        NASD's Code of Arbitration Procedure for every claim, dispute or
25        controversy arising out of or in connection with the municipal
26        securities activities of the bank dealer acting in its capacity as such.
27        *In addition, the proposed rule change requires that bank dealers*

20

1    *abide by the NASD's Code just as if they were members of the NASD*
2    *for purposes of arbitration.*[41]

3    Accordingly, MSRB Rule G-35 instructs that UBS is "subject to, and shall
4    abide by, [FINRA's] Code of Arbitration Procedure, including any amendments
5    thereto, as if the bank dealer were a 'member' of [FINRA]." Tellingly, UBS omits
6    this portion of MSRB Rule G-35 from its own analysis.

7    UBS's contention that the MSRB's definition of 'customer' supplants
8    FINRA Rule 12200 for the purposes of arbitration is simply incorrect. Memo in
9    Support at 12-13. The MSRB has directed that MSRB members are subject to the
10   FINRA Code of Arbitration for purposes of arbitration, and FINRA Rules 12200 (a
11   member of FINRA must arbitrate a dispute if "requested by a customer") and
12   12100 ("A customer shall not include a broker-dealer.") are part of that Code.[42]
13   Accordingly, FINRA Rules 12200 and 12100 are the applicable provisions on the
14   issues of arbitrability and govern whether Pasadena is a customer.[43]

15   **ii. Pasadena is a "customer" of UBS under the MSRB Rules.**

16   In any event, contrary to UBS's representation, Pasadena is a "customer"
17   under the MSRB Rules. UBS points to MSRB Rule D-9, which defines
18   "customer" as "any person other than a broker, dealer, or municipal securities
19   dealer acting in its capacity as such or *an issuer in transactions involving the sale*
20   *by any issuer of a new issue of its securities.*" (emphasis added). Relying on the
21   emphasized portion of the rule, UBS argues that Pasadena, as an issuer of

---

[41] S.E.C. Release No. 39378 (December 1, 1997) (emphasis added), attached as
Exhibit H to Burge Decl.
[42] Sections 12100 through 12905 of the FINRA Rules constitute the Code of
Arbitration Procedure for Customer Disputes.
[43] *See also Louisiana Citizens*, 712 F. Supp. 2d at 78 (S.D.N.Y. 2010) ("Because
MSRB is a distinct entity from FINRA, there is little reason its rules should
influence the definition of customer for purposes of FINRA's compulsory
arbitration agreement.").

21

1  securities, is expressly excluded from the definition.  UBS, however, neglects to

2  mention that the rule has been interpreted, *since 1978*, to exclude an issuer such as

3  Pasadena from the definition of "customer" *only* "in the case of a sale by it of a

4  new issue of its securities."  The MSRB, interpreting Rule D-9, advised:

5  > An issuer would be a 'customer' within the meaning of the rule except

6  > in the case of a sale by it of a new issue of its securities.[44]

7  In other words, an issuer such as Pasadena would remain a customer for all other

8  purposes, including for the purposes of much of UBS's conduct here, which

9  included: "participating in structuring and implementing Pasadena's 2005

10  financing … advis[ing] Pasadena on what they regarded as the appropriate capital-

11  generation structure for Pasadena's bonds; act[ing] as Pasadena's agents in dealing

12  with the rating agencies; assist[ing] with ARS-related discussions with bond

13  insurers on Pasadena's behalf; … provid[ing] monitoring and advisory services

14  regarding the bonds and the swap after the issuance; function[ing] as the main

15  broker-dealers for Pasadena's ARS auctions."  *See* Stmt of Claim at ¶ 21.  None of

16  these tasks involved the sale of new securities by Pasadena.

17  Indeed, in the light of the MSRB's publicized efforts to protect municipal

18  issuers, the notion that an issuer such as Pasadena is not a customer of its

19  underwriter-bank dealer under the facts alleged is absurd.  The MSRB has

20  repeatedly advised that its rules govern its members' activities with municipal

21  issuers.  The MSRB has interpreted its fair dealing rule, MSRB Rule G-17, to

22  require its members to honor the commitments made to municipal issuers

23  regarding distribution of the issuers' securities.  A recent interpretive notice

24  advises that:

---

[44] MSRB Rule D-9 Interpretive Notice (October 24, 1978), attached as Exhibit J to
Burge Decl.

1    The MSRB is publishing this notice to remind dealers that the fair
2    practice requirements of Rule G-17 also apply to their municipal
3    securities activities with issuers of municipal securities.[45]

4    Surely the MSRB did not intend, as UBS urges, to exclude issuers such as
5 Pasadena from the definition of "customer," and thereby deprive them of the
6 protection of regulations that were carefully drafted for their benefit.   Any
7 argument that Pasadena was not a "customer" of UBS – under either the MSRB or
8 FINRA Rules – should be squarely rejected.

9    **D.    The balance of hardships does not decidedly favor UBS.**

10   To obtain a preliminary injunction, UBS must show both that it will suffer
11 irreparable harm *and* that "the balance of equities tips in [its] favor." *Stormans,*
12 *Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal citations omitted).
13 Courts have held that parties are harmed when they are forced to arbitrate claims
14 that are ineligible for arbitration.  Even so, the harm to Pasadena if this arbitration
15 is stayed is substantial and is not outweighed by any harm to UBS.

16   Parties such as UBS routinely undertake "herculean efforts to avoid
17 resolution of disputes through arbitration." *Smoothline Ltd. v. N. Am. Foreign*
18 *Trading Corp.*, 249 F.3d 147, 148 (2d Cir. 2001).  Courts in the Ninth Circuit have
19 noted, however, that public policy favors arbitration because it provides speedy
20 and inexpensive forums for the parties.  In enacting the Federal Arbitration Act,
21 "Congress intended to avoid the unnecessary expense and delay of litigation where
22 parties had provided for the more efficient process of arbitration.  Moreover,
23 arbitration under the Act 'is intended to provide the parties to a dispute with a
24 speedy and relatively inexpensive trial before specialists.'" *Dees v. Distenfield*, 618

---

[45] MSRB Rule G-17, September 29, 2009 Interpretive Notice, *Reminder Notice on Fair Practice Duties to Issuers of Municipal Securities*, attached as Exhibit K to Burge Decl.

1   F.Supp. 123, 126 (C.D. Cal. 1985) (internal citations omitted); *see also In re Pac.*

2   *Gas & Elec. Co.*, No. 08-cv-1211, 2008 WL 2004275, at *3 (N.D. Cal. May 5,

3   2008) (noting that the purpose of arbitration is "the speedy resolution of grievances

4   without the time and expense of court proceedings").  Pasadena has a right, as a

5   customer of a FINRA member, to less expensive resolution of its claims against

6   UBS through arbitration.   Further delay through an injunction will frustrate

7   Pasadena's right to speedy arbitration of its claims, and undermine the federal

8   presumption in favor of arbitration.[46]

9        This Court should follow the Southern District of New York's opinion in

10  *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*,[47] a case in

11  which UBS sought to enjoin another ARS issuer from proceeding with a FINRA

12  arbitration.   The court held that it was not persuaded that "the balance of hardships

13  tips decidedly in UBS' favor. Rather the Court finds that further delay of these

---

[46] UBS argues that one of the reasons it will be irreparably harmed if it is forced to proceed in FINRA arbitration is that the statute of limitations on all of Pasadena's claims is expired and, under FINRA rules, UBS will not be allowed to bring a pretrial motion to dismiss on this issue. Contrary to UBS's assertion, however, the statute of limitations on a claim for breach of fiduciary duty is four years in California, see Cal. Code Civ. P. § 343, and begins to run when the plaintiff "discover[s], or in the exercise of reasonable diligence could have discovered" the breach. *Stalberg v. W. Title Ins. Co*., 230 Cal. App. 3d 1223, 1230 (Ct. App. 1991); *see also Solomon v. North American Life and Cas. Ins. Co*., 151 F.3d 1132, 1137-38 (9th Cir. 1998) ("California courts have expressly held that claims for breach of fiduciary duty are governed by the four-year statute of limitations, pursuant to CCP § 343," which begins to run after the "plaintiff discovers, or reasonably should discover, the underlying facts to his cause of action."). Pasadena did not discover that UBS had been artificially propping up the ARS market until the ARS market crashed on February 12 and 13, 2008. As such, Pasadena's filing of its Statement of Claim on February 11, 2012, is within the four year statute of limitations for breach of fiduciary duty.

[47] *UBS Fin. Services, Inc. v. W. Virginia Univ. Hospitals, Inc*., 760 F. Supp. 2d 373 (S.D.N.Y. 2011) *aff'd in part, vacated in part on other grounds*, 660 F.3d 643 (2d Cir. 2011).

24

1  proceedings would frustrate Defendants' right to a speedy arbitration of their

2  claims. This hardship is not outweighed by any potential hardship to UBS."[48]

3  **E.      An injunction in favor of UBS would not be in the public interest.**

4         In the FAA, Congress recognized a public policy in favor of arbitration, and

5  expressed a strong intent "to move the parties to an arbitrable dispute out of court

6  and into arbitration as quickly and easily as possible."[49]    That policy and

7  Congress's purpose is frustrated when parties endeavor to delay and increase the

8  expense of arbitration by costly judicial disputes over arbitrability.  Further, there

9  is a strong federal policy in favor of the conclusive effect of prior judgments.  "To

10  preclude parties from contesting matters that they have had a full and fair

11  opportunity to litigate protects their adversaries from the expense and vexation

12  attending multiple lawsuits, conserves judicial resources, and fosters reliance on

13  judicial action by minimizing the possibility of inconsistent decisions."[50]   Those

14  policy interests are undermined when parties relitigate previously decided issues in

15  multiple forums, hoping for a different outcome in front of a new decision maker.

16                                 **CONCLUSION**

17         For the above stated reasons, UBS's motion for preliminary injunction

18  should be denied.

---

[48] *Id.* at 379.
[49] *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 22 (1983).
[50] *Montana v. U. S.*, 440 U.S. 147, 153-54 (1979).

475996v.1

| | | |
|---|---|---|
| 1 | July 2, 2012 | Respectfully submitted, |
| 2 | | |
| 3 | | */s/ Todd M. Schneider* |
| 4 | | Todd M. Schneider (State Bar No. 158253) |
| 5 | | tschneider@schneiderwallace.com |
| 6 | | Jason H. Kim (State Bar No. 220279) |
| 7 | | jkim@schneiderwallace.com |
| 8 | | SCHNEIDER WALLACE COTTRELL |
| 9 | | BRAYTON KONECKY LLP |
| 10 | | 180 Montgomery Street, Suite 2000 |
| 11 | | San Francisco, California 94104 |
| 12 | | Telephone: (415) 421-7100 |
| 13 | | Facsimile: (415) 421-7105 |
| 14 | | |
| 15 | | James R. Swanson |
| 16 | | jswanson@fishmanhaygood.com |
| 17 | | Joseph C. Peiffer |
| 18 | | jpeiffer@fishmanhaygood.com |
| 19 | | Jason W. Burge |
| 20 | | jburge@fishmanhaygood.com |
| 21 | | FISHMAN HAYGOOD PHELPS |
| 22 | | WALMSLEY WILLIS & SWANSON, LLP |
| 23 | | 201 St. Charles Avenue, Suite 4600 |
| 24 | | New Orleans, Louisiana 70170-4600 |
| 25 | | Telephone:  (504) 586-5252 |
| 26 | | Facsimile:  (504) 586-5250 |
| 27 | | |
| 28 | | Counsel for Defendants, City of Pasadena |
| 29 | | |
| 30 | | |

26